Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

# UNITED STATES DISTRICT COURT

for the

District of New Jersey  ▾

## CAMDEN, NEW JERSEY

SAJID RAZA

*Plaintiff(s)*
*(Write the full name of each plaintiff who is filing this complaint.*
*If the names of all the plaintiffs cannot fit in the space above,*
*please write "see attached" in the space and attach an additional*
*page with the full list of names.)*

—v—

STATE OF NEW JERSEY, CAMDEN COUNTY,
TOWNSHIP OF GLOUCESTER, SEE ATTACHED

*Defendant(s)*
*(Write the full name of each defendant who is being sued. If the*
*names of all the defendants cannot fit in the space above, please*
*write "see attached" in the space and attach an additional page*
*with the full list of names. Do not include addresses here.)*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____
*(to be filled in by the Clerk's Office)*

Jury Trial: *(check one)*  ✔Yes  ☐No

**RECEIVED**

OCT  8 2024

AT 8:30_____M
CLERK, U.S. DISTRICT COURT - DNJ

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Non-Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | SAJID RAZA |
| Address | 51 CLEMENS LANE |
| | BLACKWOOD      NJ      08012 |
| | *City*      *State*      *Zip Code* |
| County | GLOUCESTER |
| Telephone Number | 609 560 0583 |
| E-Mail Address | SAJID.INDIA.USA@GMAIL.COM |

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known) and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | DAVID J VANNONI |
| Job or Title *(if known)* | POLICE OFFICER |
| Address | GLOUCESTER TWP POLICE DEPARTMENT |
| | PO BOX 8 BLACKWOOD      NJ      08012 |
| | *City*      *State*      *Zip Code* |
| County | CAMDEN |
| Telephone Number | |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☑ Official capacity

Defendant No. 2

| | |
|---|---|
| Name | SANDRA J GERMAN |
| Job or Title *(if known)* | DCP&P WORKER |
| Address | CAMDEN EAST OFFICE |
| | VOORHEES      NJ      08043 |
| | *City*      *State*      *Zip Code* |
| County | CAMDEN |
| Telephone Number | 856 649 4123 |
| E-Mail Address *(if known)* | |

☐ Individual capacity    ☑ Official capacity

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

Defendant No. 3

| | |
|---|---|
| Name | CHARLES NIEVAS |
| Job or Title *(if known)* | HEALTH INSPECTOR |
| Address | CAMDEN COUNTY BOARD OF HEALTH |

| | | |
|---|---|---|
| BLACKWOOD | NJ | 08012 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | CAMDEN |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[ ] Individual capacity    [✔] Official capacity

Defendant No. 4

| | |
|---|---|
| Name | JILL S MAYER (FORMER CCP), GRACE C MACAULAY- CCP |
| Job or Title *(if known)* | More defendants in attach paper work |
| Address | 200 FEDERAL STREET |

| | | |
|---|---|---|
| CAMDEN | NJ | 08103 |
| *City* | *State* | *Zip Code* |

| | |
|---|---|
| County | CAMDEN |
| Telephone Number | |
| E-Mail Address *(if known)* | |

[ ] Individual capacity    [ ] Official capacity

## II.    Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.    Are you bringing suit against *(check all that apply)*:

[ ] Federal officials (a *Bivens* claim)

[✔] State or local officials (a § 1983 claim)

B.    Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials? VIOLATION OF 4TH, 5TH, 6TH, 8TH, AND 14TH AMENDMENT. MORE VIOLATIONS ARE LISTED IN THE ATTACHED PAPERWORK

C.    Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

D.    Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

## III.    Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A.    Where did the events giving rise to your claim(s) occur?
GLOUCESTER TOWNSHIP POLICE DEPARTMENT DECIDED TO SEND ME JAIL FROM MY OWN HOME. MORE DETAILS ARE ATTACHED IN BRIEF SUMMARY.

B.    What date and approximate time did the events giving rise to your claim(s) occur?
I WAS SENT TO JAIL ON FALSE CHARGES DATED 10/30/2019. MORE DETAILS ARE ATTACHED IN BRIEF SUMMARY.

C.    What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*
A BUNCH OF STATE ACTORS AND STREET CRIMINALS CONSPIRED WITH EACH OTHER TO TARGET ME BASED ON MY RACE AND RELIGION & COUNTRY OF ORIGIN AS A SOFT TARGET. THEY WANTED TO DESTROY MY ENTIRE FAMILY. MORE DETAILS ARE ATTACHED IN BRIEF SUMMARY

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## IV.    Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.
I RECEIVED COUNTLESS ATTACKS IN JAIL SPONSPORED BY STATE ACTORS AND IT WAS RECORED ON CAMERA DATED 02/01/2021. PRIOR TO MY ARREST, I HAD A ROAD ACCIDENT AND I HAD ONGOING TREATMENT FOR MY BACK AND NECK PAIN INJURIES. ON ADVICE OF STATE ACTORS, THE JAIL DENIED ME ANY TREATMENT OR THERAPY FOR MY ROAD ACCIDENT INJURY. DUE TO PROLONGED DETENTION, I RECEIVED MORE MEDICAL PROBLEMS SUCH AS DIABETES AND HIGH BLOOD PRESSURE ETC.

## V.    Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.
I GOT PERSONAL BODY INJURIES DUE TO ATTACKS AND PERMANENT INJURIES IN MY NECK AND BACK. I GOT A PERMANENT INJURY IN MY RIGHT TORSO. PROPERTY DAMAGES, FAMILY SUFFERING, HUMILITATION FROM SOCIETY AND FINANCIAL LOSS,LOSS OF LIBERTY,PURSUIT OF HAPPINESS SUCH AS DIET,SLEEP,HUMAN CONTACT.SOCIAL ACTIVITY,FAMILY RELATION,EDUCATIONAL,VOCATIONAL,ATHLETIC,SEXUAL,TRAVEL,DEMOCRATIC ACTIVITY ECT.
I demand  $7000000.00 for my pain and suffring or any reward awarded by respactable Jury

Pro Se 15 (Rev. 12/16) Complaint for Violation of Civil Rights (Non–Prisoner)

## VI.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:    *10-08-24*

Signature of Plaintiff    *SAJID RAZA*

Printed Name of Plaintiff    SAJID RAZA

### B.    For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Address

|  | City |  | State | Zip Code |
|---|---|---|---|---|

Telephone Number

E-mail Address

**466 U.S. 668 (1984)**

**STRICKLAND, SUPERINTENDENT, FLORIDA STATE PRISON, ET AL.**

**v.**

**WASHINGTON**

**No. 82-1554.**

**Supreme Court of the United States.**

**Argued January 10, 1984**
**Decided May 14, 1984**

# Total 17 countS

Count 1 False arrest & imprisonment

Count  2 Malicious prosecution

Count 3 abuse of process amount to state terror

Count 4 Excessive abuse of judicial authority

Count 5 Warrant based on false story,lack of evidence & probable
cause

Count 6 Denial of constitutional right of public trial & self
representation

Count 7 4th Amendment fabricated evidence

Count 8 5th Amendment pro-long detention,due process

Count 9 6th Amendment speedy trial,ineffective assistance of
counsel

Count 10 8th Amendment right to free from cruel & unusual
punishment

Count 11 14 Amendment due process of law,equal protection

Count 12 1985 Conspiracy to interfere with civil rights

Count 13 NJ Law against discrimination

Count 14 NJ Mistaken imprisonment act

Count 15 NJ Tort claim act

Count 16 1986 Action for neglect to prevent conspiracy

Count 17 emotional deterss

# EXHIBIT

Exhibit 1 i sold my destroyed homeless $100000.00 compare to
home sold in same neighborhood

Exhibit 2 proof of my road accident prior to my arrest & ongoing
treatment

# CASE LAW REFERENCE REGARDING MALICIOUS PROSECUTION

## ROGERS V.CAPE MAY OFFICE OF THE PUBLIC DEFENDER FOR TORT CLAIM

### Nieves v. adolf  241 NJSC 567

NJ supreme court held that tort claims generally including legal malpractice claims were governed by the tort claim act. This includes the PD office.

### McDonough v. Smith USSC

The statute of limitations for petitioner's USSC 1983 claim alleging that he was prosecuted using fabricated evidence began to run when the criminal proceeding against him terminated in his favor

### Manuel v. City of Joliet USSC

Pretrial detanee's claim that he was unlawfully detained based on a probable cause finding that relied on fabricated evidence was properly bought under the 4th amendment rather than due process clause, pretrial detention that followed the start of legal process could violate the 4th amendment.

### Thompson v. Clark USSC

A 4th amendment claim under 42 USCS 1983 for malicious prosecution did not require a plaintiff to show that the criminal prosecution ended with some affirmative indication of innocence. A plaintiff was only required to show that the criminal prosecution ended without a conviction.

### Tower v. Glover USSC

State public defenders were not immune from liability for intentional misconduct under color of state law by virtue of alleged conspiratorial action with state officials that deprived their client of federal rights. Private attorneys are not immune from Section 1983 liability when they conspire with state officials to deprive their client of federal rights.
Buckley v. Fitzsimmons USSC

Exhibit 3 Two ANCORA report showing i am competent to stand
trial

Exhibit 4 Alibi Proof i am in PA At the time of offense shown in
NJ police report

Exhibit 5 100% false police report

Exhibit 6 order of dismissal of all charges on false excuse
without my present with transcript.

Exhibit 7 case jacket showing false trial order filled dated
03/10/23

Exhibit 8 false case created

Exhibit 9 statement CD not attached available if court demand i
got form CCPO after 4.5 years

Exhibit 10 proof of my employment & income prior to my arrest

Exhibit 11 100 % illegal,unconstitutional out of jurisdiction
issued by Richard F.Well this fixed order was written prior to
hearing

Exhibit 12 i got bunch of medical problem in jail doctor's
report attached here

Exhibit 13 showing i got ticket from twp of gloucester to cut
grass during my pre-trial release

Exhibit 14 Tort claim notice filed against State of New
jersey,camden county & township of gloucester

Date *10-08-24*                                    SAJID RAZA Pro-se

*SAJID RAZA*

Prosecutors accused of violating a murder suspect's civil rights by fabricating evidence and making false statements did not have absolute immunity from liability.

### Schever v. Rhodes USSC

The 11th amendment did not shield state officials confronted by claims. He deprived another of federal rights under color of state law. In acting under state law in order to violate the constitution , he conflicted with the constitution's superior authority.

### Malley v. Briggs USSC

In section 1983 , A state trooper was not entitled to absolute immunity. The trooper was only entitled to qualified immunity which would be lost only if his warrant application lacked indicia of probable cause so as to render it unreasonable

### Sykes v. Anderson 6th Circuit Court of Appeals

Liability of police officers for malicious prosecution in plaintiff's 42 USCS section 1983 action was proper because the officer provided the prosecutor investigatory materials which contained flagrant misrepresentation, exaggeration, omissions and prosecutions actually relied on many falsehoods in the proceeding against the plaintiffs.

United States V. Dreyer, 33 F2D 112      29 months delayed, **speedy trial rights were violated**

United States V. Battis, 589 F3D 673      45 months delayed, **speedy trial rights were violated**

### CASE LAW REFERENCE REGARDING ATTORNEY MALPRACTICE

11 A.3d 891 (2011)
418 N.J. Super. 48

**Jeffrey MARRERO and Francisco Marrero, Plaintiffs-Respondents,**

**v.**

**Howard FEINTUCH, Esquire; Feintuch, Porwich & Feintuch; Philip Feintuch and Alan Porwich, Defendants-Appellants.**

Sajid Raza, *Pro Se*
51 Clemens Lane
Blackwood, NJ 08012
Cell# 609-560-0583
Email: **sajid.india.usa@gmail.com**

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY
## CIVIL RIGHTS COMPLAINT UNDER 42 U.S.C. § 1983

| | | |
|---|---|---|
| Sajid Raza | : | COMPLAINT No. _____ |
| *Plaintiff* | | |
| | : | |
| Vs. | | |
| | : | |
| Hon. Richard F. Wells ; David J. Vannoni; | | |
| Sandra J. German; Natalie Shute; | : | |
| Grace C. MacAulay; Jill S. Mayer | | |
| Joseph Mcnamara; Linda Anne Shashoua; | : | |
| Claudia N. Eiden; Claudia Bustamante; | | |
| Brandon J. Almeida; Mary Claire Wolf; | : | |
| Andrew M. Duclair; Charles Nieves; | | |
| Sheera G. Engrissei; Brenden d. Moles; | : | |
| Jeffrey C. Zucker; Yolanda Payne; | | |
| *Defendants* | : | |

## INTRODUCTION

This case began with a rightful attempt to evict from my rental property a tenant whose conduct both reasonably and legally warranted eviction. The dispute with my tenant then devolved into a dispute with the tenancy judge, whose outrageous rulings in regard to my petition for eviction were issued in the absence of any jurisdiction, amounting to an affront, not just to my dignity as a landlord, but to basic notions of American justice—a judge whose conduct, incidentally, appeared to be corruptly motivated, as the facts at trial will show.

1

The dispute regarding the eviction then devolved into a series of false allegations made against me after I reported the abuse of foster children in my rental property to a worker at the Division of Protection & Permanency. These circumstances then formed the backdrop of my unconstitutional arrest by a Gloucester Twp. police officer and a subsequent lengthy incarceration, in violation of numerous due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, as well as my right to a Speedy Trial under the Sixth Amendment to the United States Constitution.

Henceforth, over the span of nearly 5 years, numerous actors within New Jersey Superior Court tribunals exploited my unlawful custodial status—as well as my lack of English proficiency—embarking on a series of flagrant violations of my civil rights and liberties, both procedurally and substantively. All of the violations in combination and individually were designed for the purpose of overwhelming my will to resist their constant pressure for me to plead guilty—which they ultimately failed to accomplish. Meanwhile, all of these actors ignored my constant written and oral demands for an immediate trial. Notwithstanding the nefarious and conspiratorial actions on the part of the actors in the tribunals, the final outcome was a favorable result: all charges dismissed. However, this was only after I was forced by the cruel and unfeeling gears of the law to suffer prolonged and intentional mental anguish and emotional distress, loss of liberty and property, as well as years of lost experience in regards to parenting my children.

In order to fully understand the significance of this case, however, a few more prefatory remarks are due. This is an extremely complicated case that involves numerous actors that played substitute roles for each member of the tribunal at various stages of the case. This greatly encumbers the task of telling the story in a way that captures and conveys all of the injurious conduct of every defendant—and each defendant's injurious conduct alone. Thus I have focused my effort on the task of avoiding unnecessary digressions into extraneous and irrelevant subject-matter. For these reasons, I feel constrained to stress how acutely this case epitomizes the grievous shortcomings of any judicial policy that would forbid application of *respondeat superior* to the facts of a case like this. Policies like that are the *precise reason why* pursuing meritorious claims of civil rights violations are made to seem so daunting and complex and overwhelming to average people—that is, to the very persons whose rights are most likely to be violated—as to chill litigation thereof almost out of existence. Just think how easily it would be—as in this very case—for the main parties whose orders are to be followed and obeyed simply to delegate the most injurious actions to a complex maze of myriad "assistants," thereby muddying the waters and preventing accountability of the most liable parties while denying vindication of the injured parties rights. Indeed, think how easily—also as in this very case—the consequential parties provide cover for

2

themselves and their friends, these persons closing ranks and circling each other's wagons, passing the buck onto this or that low-level assistant, as all of these same friends and members of the same corrupt system that caused the violations of civil rights are then relied upon for accountability and vindication. Can the wolves really be counted on to guard the chicken coup? Who will guard us from the guardians? Accordingly, I have endeavored to simplify the story down to its essential elements, citing the least number of moving parts to convey the story, keeping always in mind the proviso that some defendants may be added or removed at a later date.

## I.    JURISDICTION & VENUE

1)      This is a civil action authorized by 42 U.S.C. § 1983 to address the deprivation, under color of state law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). Plaintiff Raza seeks declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Plaintiff Kern pursues claims for injunctive relief authorized by 28 U.S.C. §§ 2283 and 2284 and Rule 65 of the Federal Rules of Civil Procedure. Plaintiff Raza's claims for compensatory damages related to improper impoundment of his truck are authorized pursuant to 28 U.S.C. § 2465 and Rule 65 of the Federal Rules of Civil Procedure.

2)      Plaintiff Raza asserts state civil and tort law jurisdiction under N.J Constitution Art 1., paragraph 22; N.J.S § 52:4B-36; N.J.S. 10:6-2(c); and §§ N.J.S. 59:2-2(a) and 59:3-14.

3)      The Court has supplemental jurisdiction over the plaintiff's state law civil and tort claims under 28 U.S.C. § 1367(a).

4)      The District of New Jersey is an appropriate venue under 28 USC § 1391(b)(1) because it is where the events giving rise to this claim occurred.

## II.    PLAINTIFF

1)      I am the Plaintiff, Sajid Raza. I was born in India on August 15, 1969 and emigrated to the United States in 1999.

2)      I became a naturalized citizen of the United States on or about February 2009.

3)      During part of the time mentioned herein, I was a prisoner of the State of New Jersey in the custody of Karen Taylor, Warden of Camden County Correctional Facility, in Camden, New Jersey. Since being released from custody, I live at the address cited above, 51 Clemens Lane, Blackwood New Jersey 08012.

4)      I am self-employed by the rideshare company, Uber.

# III.   DEFENDANTS

1)      **Defendant Hon. Richard F. Wells**, is a retired judge of the Superior Court of New Jersey. He was on recall at the relevant times of this complaint. He is sued in his individual capacity.

2)      **Defendant David J. Vannoni** is a police officer that works for Gloucester Township Police Department, in Blackwood, New Jersey. He is sued in his individual and official capacities.

3)      **Defendant Sandra J. German** introduced herself to me as the Regional Director of the Division of Child Protection & Permanency for the office located in Voorhees, New Jersey. She is sued in her individual and official capacities.

4)      **Defendant Natalie Shute** is an assistant prosecutor with the Camden County Prosecutor's Office. She is sued in her individual and official capacities.

**5)**      **Defendant Grace C. MacAulay** is presently the Prosecutor of Camden County. Many of her assistants are named herein as defendants. She is sued in her individual and official capacities

**6)**      **Defendant Jill S. Mayer** is presently the Prosecutor of Camden County. Many of her assistants are named herein as defendants. She is sued in her individual and official capacities.

7)      **Defendant Joseph Mcnamara** is an assistant prosecutor with the Camden County Prosecutor's Office. He is sued in his individual and official capacities.

8)      **Defendant Linda Anne Shashoua** is an assistant prosecutor with the Camden County Prosecutor's Office. She is sued in her individual and official capacities.

9)      **Defendant Claudia N. Eiden** is an assistant prosecutor with the Camden County Prosecutor's Office. She is sued in her individual and official capacities.

10)     **Defendant Claudia Bustamante** is an assistant prosecutor with the Camden County Prosecutor's Office. She is sued in her individual and official capacities.

11)     **Defendant Brandon J. Almeida** is an assistant prosecutor with the Camden County Prosecutor's Office. He is sued in his individual and official capacities.

12)     **Defendant Mary Claire Wolf** is an Assistant Deputy Public Defender with the New Jersey Office of the Public Defender. She is sued in her individual and official capacities.

13) **Defendant Andrew M. Duclair** is a private attorney that was assigned by the New Jersey Office of Public Defender to serve as the "pool attorney" for my defense. He is sued in his individual and official capacities.

14) **Defendant Charles Nieves** is an inspector with the Camden County Board of Health. He is sued in his individual and official capacities.

15) **Defendant Sheera G. Engrissei** is a private attorney with Mattleman, Weinroth & Miller, P.C. in Cherry Hill, New Jersey. She is sued in her individual and official capacities.

16) **Defendant Brenden d. Moles** is a private attorney with Mattleman, Weinroth & Miller, P.C. in Cherry Hill, New Jersey. He is sued in his individual and official capacities.

17) **Defendant Jeffrey C. Zucker** is a private attorney whose practice is located in Camden, New Jersey. He is sued in his individual and official capacities.

18) **Defendant Yolanda Payne** is a private citizen whose location is presently unknown. She is sued in her individual capacity as a co-conspirator with the foregoing official defendants.

## I.    OWNING AND RENTING MY PROPERTY

### A.  MY PURCHASE OF THE HOME

1) On or about September 2011, I purchased a home address 1709 Kingswood Place Clementon, NJ 08021 for the purpose of renting the home.

2) During most of the following story, I was incarcerated for several years.

3) During that time, the value of the home rose nominally in connection with rising home prices in and about the environs.

4) As will become clear, however, the tenant in question—who was allowed to stay in my home for nearly four years without paying me over $60k in rent owing to the conspiracy that she helped to form against me—intentionally damaged my home, causing its inherent value to sink.

5) The home also lost significant value as a result of the circumstances that these defendants individually and collectively forced me into, leading proximately to its forcible sale on short notice whereas comparable homes in the neighborhood were selling at the time for up to and more than 50% of what I was able to obtain under these unwarranted, coercive circumstances.

## B. MEETING YOLANDA PAYNE

1)      Yolanda Payne rented my home through Long and Foster, a real estate company.

2)      Long and Foster agents falsely represented Yolanda Payne as a responsible and honorable tenant, yet she soon proved to be just a street criminal and a scam artist.

3)      Based on misrepresentations at the time of the lease, I believed that only five people would live in the home.

4)      I began to suspect trouble when Ms. Payne made her first payment using a money order bearing the corporate name of a charity.

5)      Upon information or belief, at the time of the lease, Ms. Payne had been the subject of an eviction order by another defendant in the case, Honorable Richard. F. Wells.

6)      Having obtained the lease, Ms. Payne soon brought numerous additional people to live and loiter in my rental property, engaging in criminal activity within the knowledge of the police, who did nothing.

7)      Ms. Payne stopped paying rent after two months.

8)      The facts will show that she conspired with state officials, filing false complaints in the Gloucester Township Police Dept. with an ulterior purpose—a purpose to conspire with state actors to maliciously abuse court processes to imprison me and live in my home rent free.

## II.    PURSUING EVICTION

### A. THE REASON

1)      As detailed below, upon information and belief, all of these actors behaved in the manner of a corrupt organization, thereby evincing their malicious and coordinated intentions to inflict emotional distress by means of malicious use and abuse of court processes, while conspiring under the apparent aegis of Honorable Wells.

2)      Upon information and belief, once Ms. Payne took up residence in my rental property, she informed Hon. Wells that she had found a new landlord on whom to apply her malicious and abusive scheme.

3) Upon information or belief, Ms. Payne had been receiving foster girls for exploitation and abuse with the help of Defendant No. 3, Sandra J. German, Regional Director with New Jersey's Division of Child Permanency & Protection (NJDCPP).

4) Upon information and belief, soon after Ms. Payne began living in my home, she flooded the home on purpose—simply to justify withholding rent payment.

5) Based on this contrived conflict, Honorable Richard Wells awarded Ms. Payne a free and extensive stay in my home—a stay extending several months beyond our lease agreement and which was therefore *outside of the Court's jurisdiction.*

6) I filed for eviction on or about July 7, 2019. The case was docketed under no. LT-5827-2019.

7) I appeared at the eviction hearing on August 22, 2019.

8) I brought her to court to collect rent money, and I was expecting the judge to issue an order of possession, as sought and required.

9) During the first court hearing, Honorable Wells compelled me to fix the home that Ms. Payne had damaged herself.

10) Honorable Wells advised Ms. Payne to deposit the rent money in court. She only deposited one month's worth of rent money, the source of which was very suspicious.

11) At this first hearing, Hon. Wells issued an unreasonable Order to fix my rental property, which had only been damaged due to Yolanda Payne's conscious intention to flood my home.

## B. EXPERIENCES DURING SECOND STAGE OF EVICTION PROCESS

1) In September of 2019, I filed paperwork for a warrant of removal because rent was 3 months past due.

2) Honorable Wells denied this motion and returned my filing fee, His Honor scheduling a new court date for September 26, 2019.

3) At the scheduled court hearing, Honorable Wells muzzled my voice, denied my right to testify or otherwise develop the record, and in these manners violated both my rights to petition the Court for a redress of grievances and to speak freely under the First Amendment, as well as my right to due process under the Fifth and Fourteenth Amendments under the United States Constitution. Hon. Wells had no jurisdiction to do this.

7

4)      After some time, during the first half of the day, Honorable Wells advised me to appear in a different courtroom after lunch. He relayed through the sheriff that I would be called into the room "when [my] case comes up."

5)      I arrived at this other courtroom after lunch but was not permitted to enter the room. Meanwhile, my adversaries *were* permitted to be in the room, including a young foster girl that remained upset and alarmed throughout the proceedings.

6)      Upon information and belief, during this *ex parte* gathering in the courtroom, all of these malicious actors—including Honorable Wells—conspired with Yolanda Payne, presumably telling her what to say in order to advance the conspiracy.

7)      Once I was permitted in the room, even while shamelessly and overtly excluding my testimony, Honorable Wells showed obvious curiosity, concern and interest in hearing only from Ms. Payne. He asked her when her lease was going to expire.

8)      Consistent with the apparent plans, Ms. Payne falsely testified that the lease would expire in May 2020, even though it was to expire four months earlier than that, specifically, on or about January of that year, as the leasing documents proved.

9)      Ms. Payne also testified that she had 7 kids and Hon. Wells allowed this testimony to go unimpeached; he accepted her lie and denied me an opportunity to impeach her by introduction of the lease agreement, thus denying to me a fundamental process normally due as a right. This again was outside of his jurisdiction.

## C. OUTCOME OF EVICTION HEARING

1)      Instead of entering an order of possession, as required under the law and the facts of the case, Honorable Wells appeared to have a specific outcome in mind when I first appeared and he engineered that specific outcome by managing the hearing in such a way as to deny me the due process of impeaching Ms. Payne's testimony, ultimately relying on this unimpeached testimony to grant Ms. Payne *carte blanche* to remain living in my rental property for several months beyond the lease agreement—without paying rent. He had *no jurisdiction to do this.*

2)      My goal had been to amend the order. At that time I did not realize that, upon information or belief, Hon. Wells had arbitrarily turned this putative hearing for an Order of Possession into a Habitability Hearing, later sending me a completely false transcript. A forensic audit would show its complete inconsistency with the sound recording.

8

3)      Honorable Wells commanded me to pay Ms. Payne's living expenses up to May 2020. He said this verbally and also claimed I could not appeal the order. He also claimed that all of his hearings were not recorded. But the Order was issued even before the hearing, and provided to Ms. Payne.

4)      Upon information and belief, Honorable Wells spearheaded this entire conspiracy; he even returned her deposited money $1300, as planned. The money was provided by Hon. Wells's sheriff.

5)      Upon information and belief, Ms. Payne and Hon. Wells conspired to keep these criminals in my home free of cost while court staff continually delayed the court date with the purpose of keeping these criminals in my home as long as possible.

## III.    EVENTS AFTER EVICTION HEARING BUT BEFORE ARREST

### A.  ACTIONS BY YOLANDA AND HER FAMILY

1)      I filed new paperwork for eviction, this time using Sheera G. Engrissei an attorney with Mattleman, Weinroth & Miller, P.C. 401 route 70 East, Suite 100 Cherry hill, NJ 08034. The docket No. for this filing is LT-8409-19 on October 9, 2019.

2)      The errors in the paperwork filed by Sheera G Engrissei resulted in unreasonable delay in the hearing date, giving Ms. Payne and her confederates even more time in my rental property to commit crimes with impunity

3)      Thus, on October 24, 2019, I filed *new* eviction papers *Pro Se,* under docket No. LT-8990-19.

4)      Also on October 24, 2019 Yolanda Payne came to my personal residence at 51 Clemens Lane, Blackwood, NJ 08012 around 9:00 PM.

5)      Ms. Payne said she was packing her belongings to move out of my home, advising that I should pick up the key around 10:00 PM.

6)      This of course pleased me—until she also demanded that I pay her $20,000! (presumably this figure reflected her belief that I would "owe her" the balance that Hon. Wells's had Ordered me to pay regarding her "living expenses).

7) Having consumed alcoholic beverages, I asked my son to drive the car for us to pick up the key, as advised by Yolanda. When I arrived at my rental property, Ms. Payne now demanded $40,000—$20,000 for her and $20,000 for Honorable Wells!

8) When I rejected her outrageous demand, Ms. Payne then implied a threat by mentioning that her boyfriend was sitting inside of the home with a gun.[1]

## IV.   FIRST ARREST AND INCARCERATION

### A.  INTERACTIONS WITH GLOUCESTER TWP. POLICE

1) On or about October 24, 2019, specifically, around 10:10 PM I called the police to report both the conduct and implied threats of Ms. Payne. The police responded with S.W.A.T..

2) Gloucester Township police searched the home while I remained outside of it. Later the police claimed that the home did not even belong to me, but rather that it belonged to Ms. Payne on account of Hon. Wells's order. This unknown officer refused my request to enter my rental property, claiming that Hon. Wells had barred me from entering it.

3) I explained to this unknown officer that I had already sought eviction on two separate occasions, but that Hon. Wells appeared to be in league with Ms. Payne and her apparent molestation ring using young foster girls supplied to her by the Division of Child Protection & Permanency (NJDCPP).

4) Despite all of my allegations of criminal conduct and collusion between Ms. Payne and tenancy courts, the police still expected me to rely on that corrupt Court, which was clearly adversarial to my interests. I therefore left and returned to my residence.

### B.  THE PRETEXTUAL CONTEXT OF MY ARREST

1) A few days later, on October 30, 2019, I appeared at the Camden County Hall of Justice (HOJ), Special Civil Part, around 10:00 AM to inquire about the paperwork I had filed for eviction.

---

[1] I knew her boyfriend before she rented the home. He fought with me during the night time in a magnolia 7-11 store around 2014. I was working at the 7-11 as a night time employee and I called the police to move him out of the store.

2)    Two unknown court staff advised me that I would have to wait for my court date. However, we might reasonably infer from this basis that Hon. Wells presumably was made aware that I was taking persistent remedial actions within the boundaries of the law at this time.

3)    I also went to the office of the Division of Child Protection & Permanency (NJDCPP) in Voorhees Twp., New Jersey around 11:00 AM to inquire as to the status of two written complaints I had submitted against Yolanda Payne.

4)    There and then I met with Sandra J. German, who introduced herself as the Regional Director for NJDCPP.

5)    I asked Ms. German to take action against Ms. Payne, since the latter had obtained foster girls using false documentation and also because Ms. Payne was involved in criminal activity in my rental property—a property that had, in any case, been declared uninhabitable by Hon. Wells.

6)    When I asked her to take action to remove the foster girls, she said she would take the necessary action. I advised that if Ms. German did not take immediate action, I would be going to NJDCPP headquarters in Trenton to bring more pointed attention to the urgency and criminal significance of the ongoing issues in my rental property. When she assured me that she would take action, I has no reason to suspect that Ms. German intended to take such woefully adversarial action towards me.

7)    Alas, the action that Ms. German took, apparently in league with Ms. Payne and the Courts, was that these parties came together and conspired to have me arrested in my home on or about midnight of October 30, 2019, so as to eliminate me from the equation—that is, to eliminate from the equation the pesky landlord that was complaining too loudly and persistently about his property being exploited for the purpose of abusing young foster girls.

8)    Upon information and belief, all of these co-conspirators, including the police officers, acted under the aegis of Honorable Richard F. Wells, for he knew (or, presumably would have known) full well that it would be impossible for me to be released from jail without pleading guilty to some offense, thus discrediting and stigmatizing me, as well as forcing my deportation from the country while opening an opportunity to confiscate my home(s) on the sly.

9)    When that scheme failed—for I could see through it, knew I was innocent, and refused to comply by pleading guilty—they did not cease and desist but instead doubled-down

on their pressure campaign for me to "confess to a crime" and receive at least probation, which at least in theory might serve to muzzle me by discrediting any further allegations I might make.

## C. INITIAL CIRCUMSTANCES OF FALSE ARREST AND DETENTION

1) After this, I faced an onslaught of constant and regular pressure campaigns and deceitful meetings. I even suffered countless attacks and assaults that, upon information and belief, evinced a desire on the part of state actors to kill me in jail.

2) The police had sent me to jail without my reading glasses. I had my complaints. However, I was unable to read without my glasses, so I asked another inmate to read it for me. It turned out that the police inserted a bunch of bad language about black people. For these reasons, inmates threatened and assaulted me. Other inmates warned me not to ask for help reading my paperwork from other inmates. i.e., not to show my complaint to another inmate.

3) I reported the assault on February 08, 2021. An X-ray was taken and confirmed that I will have a life-long injury.

4) On November 06, 2019 the Court held a perfunctory and wholly inaccurate detention hearing.

5) The hearing took place for probably 2 or 3 minutes at 4:55 pm before Honorable Thomas J. Shusted—that is, only after my family members had been languishing in the hallways for nearly eight hours, since at least 9:00 AM that morning.

6) Hon. Shusted ordered my detention on absolutely false premises, even though I was strongly recommended for release based on the PSA objective scoring. In fact, the entire hearing was obviously intended to induce in me the kind of duress that might reduce me to a pliable state, perhaps vulnerable to a confession for an alleged crime that all parties knew I did not commit.

7) Without even bringing me into Court for the hearing, Hon. Shusted all but summarily ordered my detention, then scheduled a Pre-Indictment Conference (PIC) for the date of December 11, 2019. I only learned about this adverse outcome by calling my attorney Mr. Moles from the jail. He could hardly explain what had happened or why.

8) A few days later, Assistant Deputy Public Defender Michael B. Mccrossen came to meet me in the jail. He said that I had an offer from the state for 3 years in prison. I replied

that I did not need his help because I had hired Brenden D. Moles,[2] a private attorney with Mattleman, Weinroth & Miller, P.C. in Cherry Hill, New Jersey.

9)     Brenden D. Moles then came to see me at the jail. He said he was filing a motion to have me released on bail, and that pleased me.

10)    On January 10, 2020, private attorney Brenden D. Moles capitulated before Hon. Thomas J. Shusted during this next bail hearing.

11)    On January 16, 2020, Defendant No. 5, Assistant Prosecutor Claudia Bustamante presented the case to the Camden County Grand Jury in an unlawful manner, specifically, by calling a witness with no personal knowledge in the case and cross-examining her own witness (i.e., using entirely leading questions) to mislead the laymen grand jurors into believing that an actual crime had been committed.

12)    This conduct on the part of Claudia Bustamante constituted malicious abuse of process since her motive was obviously intended to participate in, and advance, the conspiracy that was evidently afoot. In other words, by these means Claudia Bustamante was victimizing me—the actual victim—thus advancing the criminal conspiracy through which Ms. Payne, Ms. German and Hon. Wells were attempting to confiscate my rental property, using it for the ongoing abuse of foster children.

13)    Suffering acute mental anguish and emotional distress, my only recourse at this time was to prevail over and over again on the jail's social worker to help get my discovery, since my hired attorney was so indifferent as to not respond to my pleas for help..

14)    Thus I finally received partial discovery from the Public Defender's Office on July 1, 2020—that is, after 8 months of incarceration. I say partial because it did not include the PSA paperwork upon which my detention was based, nor did it contain the fabrications on the part of Hon. Wells that had led to my arrest and detention.

15)    On February 10, 2020, Brendon D. Moles attended the illegitimate arraignment hearing on my behalf before Hon. Mark K. Chase.

16)    Upon information and belief, a jail employee told me that the officers controlling the waiting cells had been ordered by Hon. Chase to keep me in a cell with a Covid-19 affected inmate. The only reasonable inference to make from this is that the judge desired to ensure that I

---

[2] My private attorney came to meet me in jail. All of the details of his criminal acts are provided in separate documents.

13

remained at a substantial risk of death in the jail while he himself was protected by both plausible deniability as well as absolute judicial immunity. However, Hcn. Chase lacked jurisdiction in regard to these actions.

17)     Beyond this, upon information and belief, all discoverable materials or other false evidence credited by police were blocked at the behest of Hon. Mark Chase.

18)     I fired Mr. Moles on March 2, 2020.

19)     Upon information and belief, a message written by Brenden D. Moles was conveyed to the Gloucester Township Police Dept. on or about March 10, 2020. As a result, I was summoned from the jail to appear before Honorable Trabosh to answer for a series of complaints, which again, upon information and belief, could be traced back to the Hon. Wells coalition of co-conspirators.

20)     Health Inspector Charles Nieves, a defendant in this action, threatened to send my family to jail if I refused to pay the veritable extortion money he demanded Ultimately, the municipal court public defender said that if I were to plead guilty for the municipal complaint and fix the home damaged by Yolanda Payne, then my criminal charges would be dismissed and I would only have to pay a small fine of $200. I agreed but that was not the outcome I received.

21)     I complained about my ongoing unwarranted custody and experience with Ms. Payne, but Hon. Trabosh simply advised me to file paperwork for an eviction.

22)     Thus, on March 12, 2020, my son Altaf Raza once again filed paperwork that was given to him by the court employee. Specifically, he went to the Special Civil Part in Camden County Hall of Justice to file paperwork to evict Yolanda Payne.

23)     Instead of providing forms for an Order of Possession, the paperwork was for filing a general motion. It turned out to be the wrong paperwork. This delayed matters further and allowed Ms. Payne and her criminal coalition to continue living in my rental property with impunity and free of any cost.

## V.     EVENTS BETWEEN ARREST AND FIRST RELEASE

### A. NEW BAIL HEARING AND ATTORNEY

1)     On or about April 20, 2020 Honorable Mark C. Chase held another factually inaccurate bail hearing on the Zoom app. He still refused to release me but advised Assistant

14

Deputy Public Defender Mary Claire Wolf that he was free to appeal his decision in the NJ Appellate Division.

2) It is worth underscoring that this decision to keep me detained in close confinement was also during peak time of the COVID-19 pandemic, and this decision therefore unreasonably and unnecessarily put my life in danger.

3) About four months after this second detention hearing, Honorable Mark C. Chase summoned me to another one or two minute session on Zoom Court, a pool attorney named Andrew M. Duclar appearing on behalf of my defense.

4) Upon information and belief, Hon. Chase advised Mr. Duclair to procure and send to me a transcribed statement of the hearing, but I never received an audio copy, as I had repeatedly requested to no avail.

### B. COERCIVE ATTEMPTS TO MAKE ME PLEAD GUILTY

1) Honorable Mark K. Chase held a useless and mostly symbolic pretrial conference on November 10, 2020.

2) Upon information and belief, Mr. Duclair was acting on the advice of Hon. Chase when he sent me a false pre-trial memo by fax in jail.

3) One very serious and unprovoked assault was recorded on camera on February 1, 2021. An inmate named "Fox" had asked me to plead guilty, upon information and belief, on advice from the Camden County Prosecutor's Office (CCPO). I told him that I was waiting for trial, but he persisted and continued to pressure me into pleading guilty.

.I reported the assault on February 08, 2021. An X-ray was taken and confirmed that I will have a life-long injury

4) On September 13, 2021, without any notice, the judge in my case changed from Honorable Mark C. Chase to Honorable Yolanda C. Rodriguez, and with that change my experience went from bad to worse. Indeed, it was at this point that all of the gamesmanship and duplicity seemed to increase in power and frequency, utilizing even the help of my fired attorney, Andrew M. Duclair.[3]

---

[3] I say that I fired him because I made many written and oral requests to represent myself henceforth.

15

5)      On October 7, 2021. Mr. Duclair came to see me at the jail. His most obvious intention was to rattle me and generate fear in me, intimidating me with the implication that the most significant attack of the Courts was soon to come.

6)      Having acted to instill fear in me for the purpose of reducing me to a pliable lump of putty, hence vulnerable to easy persuasion, he then claimed to have negotiated the "best deal" for me: he expected me take time served and get out of the country within one week or spend the rest of my life in jail. He made it clear that all the other parties were working together with the goal of convicting me.

7)      There was no discussion of vindicating my rights or my innocence, no discussion of evidence or how he was going to have me released. Instead, the palpable presumption was that I was guilty and that I was expected to play along with this whole scheme, pretending that I was innocent or that I had no rights, and certainly no right to make anyone's job more difficult. These were all the reasons I had fired him.

## VI.    EXPERIENCES WITH TRIBUNAL AFTER RELEASE

### A. CONFLICTS WITH COURT, CIRCUMSTANCES SURROUNDING FIRST RELEASE AND REARREST

1)      Upon information and belief, Hon. Rodriguez advised Mr. Duclair to file a baseless motion for a hospitalized psychiatric evaluation on February 02, 2023.

2)      The first psychiatric evaluation was done online in jail, probably because I had continually demanded a speedy trial and also because I had gotten so fed up with putative defense attorneys that I had filed to represent myself.

3)      Eventually, an unknown jail employee brought me outside the jail for a transport, lying to me by saying that we were going for a medical checkup at Temple University, which I hoped (and believed) was in regard to the back injury I had suffered before my incarceration. Instead he dropped me off at the ANCORA psychiatric hospital, where I faced even more violence from criminals in ANCORA.

4)      I returned to the jail from ANCORA several weeks later on March 28, 2023.

5)      Soon thereafter, on April 11, 2023, I was finally released from jail—albeit on the highest level of supervision of level 3+ without any real basis in fact or law.

6)    Corrections officers gave me paperwork with conditions of release as I was leaving. The paperwork said that all parties had agreed to the terms and conditions. However, I did not agree to any of these terms and conditions: they were imposed on me without my knowledge or consent.

7)    Although the original charges had been based on claims about supposedly inculpatory text messages and emails, the CCPO refused to release these to me, since, as I believed then and later discovered to be true, such texts and emails were actually *exculpatory*. The actual fact is that the police and Hon. Wells put words into the mouths of my so-called accusers.

8)    On May 19, 2023 I went to the Criminal Division during my home arrest to obtain my case file, but again it was blocked on account of Hon. Chase and Hon. Rodriguez.

9)    The Criminal Division declined to give me paperwork for my trial preparation.

10)    Hon. Rodriguez gave me an impossible court date of May 19, 2023. The reason I call it impossible is that, when I came to court for what I thought would be a trial, the court was mostly closed to the public.

11)    In any case, I received from the Criminal Division a new trial date for June 12, 2023. I also informed the court that I had been living on the street without food, transportation, money or phone. I was also suffering numerous medical problems. Even so, I would be coming for trial.

12)    I came to court for trial on June 12, 2023, but Hon. Rodriguez and Mr. Duclair conspired and informed me that there would be a new trial date of July 31, 2023. I tried to fire Mr Duclair again in the courtroom but Hon. Rodriguez ordered the sheriff to remove me from the room.

13)    I had an appointment with doctors and therefore went to get an MRI and X-RAY.

14)    I called the pretrial officer to give me permission to cut the grass on my looted home because the Township of Gloucester kept issuing tickets for this and other harassing reasons, but the pretrial officer denied that.

15)    Instead, my partial services officer trapped me legally between a rock and a hard place, knowing how it would prejudice me. Also, as luck would have it, the battery on my car died.

16)    My Pretrial Services Officer called for me and Hon. Rodriguez issued a warrant for my arrest.

17)    I went back to jail dated June 14, 2023 to await trial. I informed the court I was in jail and once again, as always, demanded an immediate trial. However, the Court put my paperwork in the trash without scheduling my trial.

18)    During my detention hearing, on June 19, 2023, without calling me into court Mr. Duclair warned me to plead guilty otherwise he will enter a false guilty plea on my behalf and I am going to involuntary commitment, thus facing the final attack from violent criminals.

# VII.    EVENTS AFTER REARREST

## A.  EXPERIENCES WITH JAIL STAFF

1)    Upon information and belief, jail staff denied my treatment for back pain related to a road accident that had happened prior to my arrest. This failure to bring me to my treatments resulted in the severe prejudice that I was unable to pursue compensation for my injuries.

## B.  VARIOUS OTHER IRREGULARITIES AND DUE PROCESS VIOLATIONS

1)    It took three and a half years of baseless imprisonment, languishing under the prejudice of incarceration, for me to learn of the plot regarding when Hon. Wells changed the trial regarding an order of possession into a trial for habitability.

2)    I would also like to add that Hon. Trabosh  allowed numerous similar charges to terrorize the rest of my family members, forcing them to move out of the country and allowing them to take over my other home.

3)    On April 08, 2023, Hon. Rodriguez summoned me to her court room for about 3 minutes without any other person in the room. Finally, the judge summoned Mr. Duclair to her room and advised him to appear on the TV by cell phone. She also told me that I would be released that day.

4)    On or about June of 2023, Mr. Duclair notified me by email that he was appointed by the Court as standby counsel. I have this email in my possession. However, he later filed another misleading and prejudicial motion without my knowledge.

5)    Later he again said that he had filed a motion to dismiss my indictment, but he actually continually kept citing unverifiable pretexts to keep me languishing in jail, just to make me more amenable to baseless confession under the euphemistic heading "plea agreement."

6) I came to court for trial on June 6, 2023, but Hon. Rodriguez and Mr. Duclair informed me that there would be a new trial date of July 31, 2023. Hon. Rodriguez ordered the sheriff to remove me from the room.

7) I was ready for trial from the first day of my arrest. Incidentally, the test for whether I could represent myself is also the same test for whether I was competent to stand trial, and there was never a question about my general competency until I began requesting to represent myself. Court staff put my motions in the trash.

8) Repeatedly on paper and orally I proclaimed my desire to represent myself. During my time in pretrial custody, over the course of more than four years, I filed countless motions and letters asking the Court to allow me to appear *Pro Se* and represent myself at trial, while continually demanding an immediate trial—two rights that are supposed to be guaranteed by the Sixth Amendment to the United States Constitution, but were not provided.

9) I even petitioned this Court several times via *habeas corpus* in an attempt to force the state court to bring me to trial, although this Court declined to intervene.

## C. <u>MORE CHANGES AND CONFLICTS WITH ATTORNEYS</u>

1) While in custody, on or about March 03, 2024, I finally decided to call the well-known criminal defense attorney Jeffrey Zucker.

2) Accepting a $7500.00 check as his fee, Mr. Zucker came to meet me in jail for 15 minutes.

3) For this sum I believed I had every right to expect Mr. Zucker to file specific paperwork to open a new detention hearing and also to dismiss the indictment.

4) Alas, once again I came up against the culture of negation that seems to prevail among defense attorneys in Camden County: to my great consternation, Mr. Zucker statedly flatly that he was "negotiating a plea deal" (i.e., in my view, a "coerced confession," considering my demonstrable innocence and well-known rights) to include "time served" with the condition that I would also self-deport in one week. This was the same "deal" that a free attorney could arrange.

5) Mr. Zucker also said if I rejected this "plea deal," which of course I did, then the state would see to it that I was convicted one way or another. Specifically, he advised that the state had filed a motion for involuntary commitment, which would not only deprive me of my freedom but also confine me to a small space where I would be vulnerable to assaults by inmates

19

that are apt to curry favor with the state but doing their dirty work while keeping their hands clean.

6)      It was for the foregoing reasons that I so quickly changed my mind, telling Mr. Zucker that I no longer wanted his help.

7)      I asked him to return my money. I myself never actually hired him, I never signed any documents with him. Later he returned $6000, which means he charged me $1,500 *for a fifteen minute consultation!!* In a sane and just world—that is, in a fully integrated world where hypocrisy is not the ruling principle—this conduct would be evidence of racketeering and extortion.

8)      From all of this I got the hint that many of these state actors—in whose custody and therefore at whose mercy I remained—had in mind the goal of managing my custody with willful and indifferent recklessness, i.e., with enough risk or general disregard for my safety that it created the conditions which might allow someone in the jail to take my life while the state actors themselves remained shielded from suspicion by plausible deniability.

9)      Probably more than one hundred times I implored Mr. Duclair before and during this time to release my paperwork. However, just as many times he refused and simply stonewalled me.

### D. **RETURN TO ANCORA**

1)      On or about March 13, 2024, correction officers again delivered me to the custody of ANCORA psychiatric hospital.

2)      Once again doctors at ANCORA evaluated me for a determination of my competency—for the second time, after more than a four year span of mental anguish and emotional distress while languishing under the prejudice of an incarceration solely designed to accomplish the goal of stealing my rental property and using it to molest foster girls.

3)      As soon as they got the answer from the doctors that they wanted,[4] the Court dismissed my indictment on April 26, 2024. ANCORA released me one day later.

4)      In sum, I spent 54 months incarcerated, two months of which were on Level 3+ monitoring conditions. All of these years of incarceration were intended to pressure me to

---

[4] I had two perfect reports from ANCORA. Last release order was issued by Judge Gwendolyn Blue on the mistaken advice of state doctors.

confess to crimes that I did not commit while agents of the State of New Jersey tried to confiscate my home for use and abuse of foster children.

5)    After 45 days of release, I *finally* received my case file from the criminal division—that is, almost two months since the charges were dismissed and almost 56 months since my arrest.

6)    In the end, I was prosecuted in a manner similar to that of Ted Kacynski, although the system was unable to convict me of anything because I did not commit a crime. Surely it is not a crime to report that I was the victim of a crime!

## VIII.    CLAIMS FOR RELIEF

### A. MALICIOUS PROSECUTION, ABUSE OF PROCESS, AND CONSPIRACY BETWEEN A PRIVATE PARTY AND STATE OFFICIALS TO VIOLATE NEARLY EVERY CHERISHED RIGHT I HAVE

Before a jury of my peers, I shall prove by a preponderance of evidence that Yolanda Payne conspired with state officials for the following purposes:

1)    Intentionally destroying my rental property in order to generate fines and tickets while extorting money from my family members by means of threats to deport them..

2)    Turning my rental property into a house of ill-repute.

3)    Conspiring with Gloucester Township police officers, New Jersey Division of Child Protection & Permanency workers, and the staff and judges of Camden County tenancy courts to advance the steps involved in their plan to smear, defame and accuse me of crimes, even though I was the actual victim of the torts and crimes mentioned herein.

4)    These acts were intended both to punish me by the process of arbitrary and malicious prosecution and to muzzle, stigmatize and discredit my voice, thus eliminating me from having any ability to observe, complain or otherwise expose the malice of their conduct.

5)    Subjecting me to the dreadful exasperation—the mental anguish and emotional distress—of languishing for several years under the prejudice of undue pretrial incarceration; whereas judges, court staff, assistant prosecutors, and—to their great and everlasting shame—even so-called defense attorneys ignored all of my regularly written and oral proclamations of innocence, my pleas for vindication of my rights, my demand for a plethora of

fair and due processes—including a speedy trial, to confront my accusers, and to represent myself.

6)       From start to finish, this veritable ordeal would have found a nod of approval from any Grand Inquisitor or Star Chamber, albeit the prosecution and outcome was more reminiscent of Ted Kacynzski's, had his charges been dismissed and were he set free: my charges were eventually dismissed on account of the entire tribunal's unwillingness to accept the answer *yes* to its question of whether I was competent to stand trial, and thus was I deprived of the benefit of vindication of my innocence and rights by a jury of my peers in a timely manner.

## B. **FINANCIAL PRIVATIONS**

1)       As noted, as a result of the false imprisonment and malicious prosecution, I lost four and a half years of productive earning potential as I languished in jail demanding a trial that never came.

2)       Ms. Payne was permitted to live in my home, developing its reputation as a location where criminal denizens would congregate, without paying rent for about four years at a personal cost to me of more than $60k. This was happening while I was still required to pay property taxes in the amount of **$4,600** annually over a four year period.

3)       It cost me unknown thousands of dollars to repair the damage that Ms. Payne and her criminal associates caused in and to my home, and a combined cost of several more thousands paying fines and associated attorney fees in regard to alleged violations of local ordinances.

4)       I suffered a personal loss totaling **$10,000** in the course of paying defense attorneys and also attorneys to help with eviction.

5)       As noted in the beginning, I was forced by these circumstances to sell my rental property on short notice—and this at a loss of nearly 40% compared to what comparable homes were selling for in the local area.

6)       I also suffered financial loss as a result of being forced to sell stocks at a much lower price than I would have gotten had I held onto the stock, which I would have done had I not been forced to sell by these circumstances.

7)       I was also compelled to borrow around $400,000 from my relatives in order to maintain my family from jail.

8)       I was also forced by these circumstances to sell my 2017 Toyota Camry 2017 for much less than I would have received under normal circumstances.

## C. **SUBSTANTIVE DUE PROCESS VIOLATIONS UNDER THE 14TH AMENDMENT TO THE UNITED STATES CONSTITUTION**

1)      I spent about 54 months incarcerated, languishing under the prejudice of incarceration without the benefit of a fair trial, which I demanded the entire time—not to mention all of the distressing and damaging conduct that Ms. Payne and her confederates inflicted on me in the months leading up to the

2)      All of the undue time that I spent incarcerated also deprived me of years of meaningful opportunities to help raise my two children, alienating us from each other. I also lost that time in terms of relations with my beloved wife, who was left to fend for herself and without the comfort and security of our long marriage.

3)      Although the indictments were dismissed, I now appear to have a criminal record showing that I was arrested for very serious allegations that are apt to imperil my future employment and friendship prospects. Indeed, the entire ordeal forced me to live for years under a cloud of suspicion and opprobrium.

## IX.    **REQUESTED RELIEF**

1)      Issue a **Declaratory Judgement** consistent with each clause of each subsection §VIII of the instant complaint.

2)      Issue an **Injunction** compelling any agency of any branch of government in the State of New Jersey to turn over to me any records pertaining to my arrest, and another **Injunction** enjoining either of the same agencies of either branch of government in the State of New Jersey from retaining or sharing with the public any such record.

3)      Award **Compensatory Damages** for the loss of the value of my home, my loss of potential financial gain during the years of my incarceration—to include the years of unpaid rents; and compensation for all fines and attorney fees I incurred as a result of the myriad constitutional violations stated herein. I asked that these damages be awarded against each defendant jointly and severally.

4)      Award **Punitive Damages** jointly and severally against each defendant, at triple the amount of the compensatory damages, for each act of willful and malicious misconduct on the part of each defendant.

23

**BY MY SIGNATURE BELOW, I, SAJID RAZA, DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT**

10-08-24
DATE

SAJID RAZA
SAJID RAZA, *PRO SE*